# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
October 2, 2012 Session

## STATE OF TENNESSEE v. KEN PARKER

**Appeal from the Criminal Court of Shelby County**
**No. 09-08166    W. Mark Ward, Judge**

---

**No. W2011-02125-CCA-R3-CD  - Filed February 14, 2013**

---

Ken Parker ("the Defendant") was convicted by a jury of first degree felony murder and first degree premeditated murder.  The trial court merged the first degree premeditated murder conviction into the first degree felony murder conviction and sentenced the Defendant to life imprisonment.  On appeal, the Defendant asserts that the trial court erred in not granting a mistrial with respect to a police officer's testimony.  Additionally, the Defendant alleges that the evidence presented at trial was insufficient to support his convictions.  After a thorough review of the record and the applicable law, we affirm the Defendant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments**
**of the Criminal Court Affirmed**

JEFFREY S. BIVINS, delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Joseph S. Ozment (on appeal) and Larry Copeland (at trial) Memphis, Tennessee, for the appellant, Ken Parker.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Neal Oldham and Paul Hagerman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Factual and Procedural Background

A Shelby County Grand Jury indicted the Defendant and Marquis Ingram on one count each of first degree felony murder and first degree premeditated murder.  Prior to the

Defendant's trial,[1] he moved to suppress his statement made to police. The trial court held an evidentiary hearing on the Defendant's suppression motion and subsequently denied the motion.[2] The Defendant proceeded to a jury trial held July 18-19, 2011.

Janie Patterson, the victim's mother, testified at trial that the victim, a twenty-five-year-old male, was her youngest of three children. At the time of his death, the victim was working in a construction job in downtown Memphis. She identified a picture of her son, the victim. Three days after she last saw the victim, she received a phone call from the police department, and she went to the Regional Medical Center. When Ms. Patterson arrived, the victim was "barely hanging on" and "[h]ooked up to all kinds of tubes." While she was there at the hospital, the victim passed away. On cross-examination, Ms. Patterson estimated that the victim was approximately six feet, one inch tall and weighed approximately two hundred pounds.

Michael Smith testified that at approximately 4:00 a.m. on September 9, 2009, he walked from his home on Latham Street in South Memphis to a nearby Shell gas station with his girlfriend. While walking on Patton Street, he noticed a figure on the ground in the street next to the curb. As he approached the figure, Smith realized that it was a young man[3] who had been shot. Smith then called the police. He recalled that another couple also was nearby when he found the victim. On cross-examination, Smith confirmed that the victim was known around the neighborhood for stealing bikes and using cocaine. He knew the victim as "Big Shank," and Smith identified a "shank" as a knife. Other than seeing the victim in the neighborhood and knowing of his reputation, Smith had no previous interaction with the victim.

Darron Hickman testified that in September 2009 he was living on Latham Street in South Memphis. At approximately 4:00 a.m. on September 9, 2009, Hickman and his girlfriend left their house to go to work. They decided to walk down Patton Street so that they could stop at the Shell gas station to buy cigarettes. They approached Smith, who drew Hickman's attention to someone on the ground. Hickman stood approximately four or five feet from the victim and noticed blood on the ground. After Smith called the police, Hickman walked to the Shell gas station and told an attendant, a security guard, and a neighbor what he had seen.

---

[1] The Defendant and Ingram were tried separately.

[2] Because the Defendant does not present a suppression issue on appeal, we will not include a summary of the testimony from the suppression hearing.

[3] The young man later was identified as the victim in this case.

At the time that he observed the victim, Hickman did not know the identity of the victim. However, he heard later that it was a man he knew as "Shank," and he explained that the two of them attended elementary school together. Hickman identified the Defendant as someone he knew from his neighborhood and stated that they "rapped" together at Hickman's small recording studio. On cross-examination, Hickman agreed that he might have bought cigars from the Shell gas station but denied smoking marijuana that day.

Simeon Prather testified that on September 9, 2009, he worked as a security guard at a Shell gas station in South Memphis. His shift lasted from 6:00 p.m. until 6:00 a.m. Between 4:00 and 5:00 a.m., police officers spoke with Prather and reviewed video from the evening on the Shell gas station computer system. Prather identified at trial the discs that included video of the evening from inside and outside the store. He believed that the victim's nickname was "Stank." On cross-examination, however, he agreed that the victim's nickname could have been "Shank." He had seen the victim in the Shell gas station that night before he was shot. Prather knew the victim as a store customer but also as someone who asked others for money outside the store. He identified for the police items near the victim's body as the items that the victim had purchased at the Shell gas station that evening.

Sergeant Mundy Quinn of the Memphis Police Department ("MPD") testified that he was assigned to the homicide bureau and that he was the lead investigator in the present case. At some point, the Defendant became a suspect, and Sergeant Quinn and another officer, Sergeant Lundy, interviewed him. Upon reading the Miranda rights to the Defendant, the Defendant indicated his understanding and signed the waiver of those rights. In the initial interview, the Defendant denied having any involvement in the victim's death, despite his presence with the victim on surveillance video from the Shell gas station. In Sergeant Quinn's opinion, the Defendant did not seem upset during this interview. Upon the Defendant's denial of any involvement, Sergeant Quinn left and allowed another officer, Sergeant Goods, the opportunity to interview the Defendant.

On cross-examination, defense counsel asked whether Sergeant Quinn or another investigator went to retrieve the Defendant from school for questioning, and Sergeant Quinn responded that it was another investigator. Defense counsel then asked, "Another investigator did? Is it fair to state were you the directing officer in this investigation or were you just doing what you were told?" Sergeant Quinn answered, "Well, I mean, there was [sic] two separate investigations going on at once." After making an objection, defense counsel, in a bench conference, stated, "I wasn't trying to get there. He tainted my jury. He just told them there were two investigations going on with [the Defendant], Judge. I'm going to make a motion for mistrial based on that answer." The trial court dismissed the jury, and the following interaction commenced:

-3-

Defense: Judge, I'm going to make a motion for mistrial. Officer Quinn just stated there were two investigations going on at the moment. It's going to make the jury believe those two investigations are of [the Defendant]. I mean, that's – I just asked him what his involvement was in this investigation. I no way opened the door to say that there were two investigations or any other investigation.

That's – I mean, that's highly prejudicial to my client, Judge, for him to be able to come out and say there were two investigations going on. I mean, what else are they supposed to think other than that there were two investigations going on concerning [the Defendant]?

. . . .

And now we're talking about evidence – potential evidence of another crime coming before this jury. They should have directed their witness, Judge, to make sure that he was cautious in his answers and not be able to come up here and say, yeah, well there were two investigations going on. That – I didn't open that door, Judge. I just asked him –

Court: Well, let me ask you where were you going with that answer that there were two investigations? What did you mean by two investigations going on?

. . . .

What was your involvement in the case I think was the question.

. . . .

Witness: It was just – there was [sic] two investigations going on. There was [sic] two homicide investigations going on.

. . . .

Court: So, [the Defendant] was a suspect in two homicides?

Witness: Right. And when you asked me if I was the lead investigator, yes, but so was Sergeant Freeman on his case. And you ask me, you know, if I was directed to do something or if I was directing, if I remember correctly.

. . . .

Court: Well, I mean, number one: You shouldn't be going into this other case. I mean, a rookie would not make that mistake.

. . . .

All right. Number two: Two investigations, that's all you got out. It's not two investigations on him, two investigations – I mean, we don't know what the two investigations are. It's pretty generic at this point, so I don't see any harm.

Defense: Well, that's pretty speculative for the jury at this point. Now they're going to be wondering what in the world he meant by the two investigations.

Court: Well, do you want to ask him in front of the jury what the two investigations were?

Defense: Well, I can't do that, Judge. That's going to open the door to what I don't want.

Court: So, I think I would leave it alone. I mean, the two investigations could mean that they were looking into this Marquis [Ingram] fellow.

Following more discussion by the trial court, the State, and defense counsel, the trial court denied the defense's motion for mistrial. Defense counsel did not request a limiting instruction.

Defense counsel continued his cross-examination. Sergeant Quinn testified that the Defendant was seventeen years old at the time of questioning. He noted that, in terms of extra precautions given the Defendant's age, he attempted twice to contact the Defendant's mother but that she never answered. At approximately 6:00 p.m., Sergeant Quinn finally spoke with the Defendant's mother and informed her that the Defendant was in the homicide bureau.

Sergeant Darren Goods of the MPD testified that he was assigned to the homicide division and assisted in the investigation of the present case. He interviewed the Defendant after Sergeant Quinn and another officer had spoken with the Defendant. Eventually, the Defendant admitted his involvement and explained to Sergeant Goods what had transpired in this case. Sergeant Goods read the following from the Defendant's statement:

Question: On Wednesday, September the 9th, 2009, at approximately 4:20 a.m., Reco D. Patterson was the victim of a criminal homicide that occurred at Patton and Lucy. Are you the person responsible for this homicide?

Answer: Yes, followed by his initials, K.P.

Question: Do you know – sorry. Did you know Reco Patterson prior to this incident?

Answer: No. And that's [the Defendant's] signature on the bottom of page one.

Question: What type of weapon did you use?

Answer: A .32 Chrome with a duct tape handle revolver.

. . . .

Question: How many times did you shoot Reco Patterson?

Answer: Four.

Question: Were you alone or was there someone else with you during this incident?

Answer: It was someone else with me.

Question: What is this person's name?

Answer: Marquis Ingram.

. . . .

Question: What part did Marquis Ingram play in this incident?

Answer: He just threw the shoes away.

. . . .

Question: Was anything taken from the victim during this incident?

-6-

Answer: Just money. I don't know how much.

Question: What did you do with this money?

Answer: I don't know. I spent it though.

. . . .

Question: Who took the money from the victim?

Answer: I did.

Question: Where did you get the money?

Answer: Out of his shoe.

. . . .

Question: Can you tell me in detail the events that took place before, during, and after this incident?

Answer: Before me and Marquis went to the Shell, we heard the victim . . . talking about some money to some lady, saying he was going to pay her and she didn't want to hear what he had to say. . . . So, he left and went to the Shell. Me and Marquis went to the Shell too.

On our way back from the Shell, I tried to rob him. He rushed me, I shot, and that was . . . what happened. After I shot him, I just went on ahead and got the money and walked off with his shoes and the money. Marquis threw his shoes in the garbage and then I went to my grandma's house.

Sergeant Goods identified photographs labeled by the Defendant identifying himself and Ingram at the Shell station. The Defendant also identified the victim in the picture. The Defendant told Sergeant Goods that he gave the weapon to a male named Derek Taylor. Sergeant Goods eventually retrieved that weapon from Taylor's father.

On cross-examination, Sergeant Goods testified that he never tried to contact the Defendant's mother before taking the Defendant's statement. Sergeant Goods acknowledged that he spoke with Ingram before his interview with the Defendant. During his interview with the Defendant, he verified the Defendant's statement with the information from the

crime scene report and the interview with Ingram. According to the crime scene report, the victim had been shot four times, and his shoes had been taken. Sergeant Goods described the Defendant as fairly calm during the interview.

Sergeant Michael Hill of the MPD testified that he worked with the crime scene division and responded to the crime scene in this case at 5:39 a.m. on September 9, 2009. At the time that Sergeant Hill arrived at the scene, the victim's body no longer was present. He observed and collected from the scene "a t-shirt with what appear[ed] to be blood on it, two cigars, some cheese dip, a set of keys, . . . an open pack of Newports, and a smoked cigarette." He identified each of these items in pictures from the crime scene. On cross-examination, Sergeant Hill acknowledged that he did not collect fingerprints or DNA from the scene. He did not know if the items were sent away for forensic testing because his job consisted solely of collecting and "tagging" the items.

Sergeant Paula Harris of the MPD testified that she worked in the homicide bureau during the present case. As part of her involvement in the case, Sergeant Harris retrieved five bullet packs from the medical examiner's office around the time of September 24, 2009. She identified the bullets at trial as the evidence that she sealed in an envelope.

Dr. Marco Ross, a medical examiner and forensic pathologist with the Shelby County Medical Examiner's Office, testified as an expert in the field of forensic pathology. He performed an autopsy on September 10, 2009, on the victim in this case. Dr. Ross observed "various injuries on the body that included some abrasions and lacerations on the face and four gunshot wounds." He determined that the cause of the victim's death was multiple gunshot wounds and considered the manner of death a homicide.

Dr. Ross further explained his findings following an internal examination:

There is a gunshot wound on the top of the head. That gunshot wound went through the skull and there [were] some bullet fragments left in the scalp just before going into the skull and then the bullet continued into the brain – or at least part of the bullet did – and left part of the – on the left side of the brain, they left a track on the left side of the brain and we recovered a bullet fragment from inside the left side of the brain.

The other gunshot wound, the second one that we described, went into the head just in front of the left ear and that bullet continued into the base of the skull. Basically, into a bone skull that we call the petrous bone. This is a large bone. Sort of as you travel from the ear to the center part of your head inside the brain, you have to pass through the petrous bone. And the bullet

ended up inside that particular bone, causing a fracture on the base of the skull right up against the underside of the brain.

The third gunshot wound that we described entered into the back side of the neck on the left side. And the bullet basically went through some muscle and fatty tissues on the left side of the neck and ended up inside the cheek and we recovered a bullet from the left cheek.

The fourth gunshot wound we described went into the left mid-back. That bullet went through the – through the back part of the left lung actually and then it went through the diaphragm, which is a muscle separating the chest organs from the abdominal organs. And after going through the diaphragm, the bullet is now passing through the upper part of the abdomen. And actually the bullet then went through part of the colon or large intestine in that part of the abdomen.

The surgeons that actually operated on him had removed that portion of the colon. The bullet then continued on through the – again, the diaphragm. In the front of the body, we found the bullet inside the left chest cavity.

Dr. Ross surmised that the wound to the back that penetrated the lung and colon, as well as the wound to the top of the head, would have been potentially lethal. From the four gunshot wounds, Dr. Ross recovered five bullet packs. He further explained,

From the gunshot wounds associated with the top of the head, we separated that into two packs. Since the bullet fragments were from different locations, we collected the bullet fragments from the scalp tissues that went into one pack and then the bullet fragment that we found in the brain went into another pack.

He identified the bullet packs previously identified by Sergeant Harris.

Dr. Ross testified that the toxicology report indicated the presence of ethanol in the victim's body at a level of .028 on a breathalyzer scale. Additionally, the report revealed the presence of some breakdown products of marijuana and cocaine. The presence of the breakdown products indicated that the victim had used marijuana and cocaine within the past twenty-four hours but likely not within the immediate minutes leading up to the incident.

Dr. Ross identified photographs of the victim and noted that three of the lacerations on his face had "a ring-like character to them, meaning that a hollow, cylindrical-shaped

object impacted those particular areas to cause those lacerations." He could not determine what the cylindrical-shaped object was but acknowledged that it could have been the barrel of a gun. Dr. Ross estimated that the victim was at least three feet from the gun when shot.

Marquis Ingram testified that he was eighteen years old and had been indicted for the crimes in the present case. He had known the Defendant for approximately five years because he lived near the Defendant's grandmother's house. According to Ingram, he and the Defendant were close friends. On the night of the incident, Ingram and the Defendant were at the Defendant's grandmother's house. At some point, the Defendant asked Ingram to go with him to the Shell gas station to get some food. On the way there, they observed the victim knocking on an apartment door and "asking about some money." Ingram did not know the identity of the victim at that time.

Ingram observed the victim put the money in his shoe and relayed that information to the Defendant. According to Ingram, he did not have a gun with him, but the Defendant had showed him a gun in the Defendant's pocket. This gun was a .38 with a brown handle. The Defendant then informed Ingram that he was going to rob the victim. Ingram and the Defendant followed the victim at a distance as the victim went to one store, which was closed, and then eventually to the Shell gas station. Ingram and the Defendant separated as they followed the victim, and once Ingram reached the Shell gas station, the Defendant was walking with the victim. All three men walked inside, and once Ingram and the Defendant left the store, they went to a side street where the Defendant waited for the victim. Ingram continued walking to the end of the street, but, before crossing the street, he heard gunshots. He ran back to find the victim on the ground. When he asked the Defendant whether the Defendant shot the victim, the Defendant answered affirmatively. The Defendant was kicking the victim "[t]o the head or somewhere near the head," and the victim was not moving. The Defendant confiscated the victim's shoes as well as some food, and Ingram and the Defendant left the scene. According to Ingram, the Defendant "dumped the shoes in the garbage can, went to his grandma's house, washed his hands, and told [Ingram] to walk him halfway home." As they walked to the Defendant's house, the Defendant told Ingram that he would kill Ingram if Ingram told anyone what happened. Ingram described the Defendant's demeanor as calm.

Approximately a week later, Ingram turned himself in and gave a statement to police. On cross-examination, he admitted that he initially was not truthful to the police. He acknowledged that the Defendant never stated that he was going to shoot or intended to harm the victim. He also acknowledged telling the police that he was ten feet away from the Defendant when the Defendant shot the victim, but Ingram reiterated at trial that he did not see the shooting.

-10-

Derek Taylor, Sr., testified that he lived in South Memphis in September 2009. He was living both at his girlfriend's house and at his parents' house. His son, Derek Taylor, Jr., also lived with his parents. On September 16, 2009, Taylor, Sr. found a small handgun in a shoe box in a bedroom at his parents' house. He removed the gun from the house and did not tell anyone about it until detectives called to ask about its presence. He agreed to meet the detectives at a Texaco station where he directed the officers to where he hid the gun.

On cross-examination, he acknowledged that Taylor, Jr. had been staying in the bedroom where the gun was found. Taylor, Sr. never had seen the gun before finding it in the shoe box that day.

Sergeant David Parks of the MPD testified that in September 2009 he was assigned to the homicide division. He assisted Sergeant Goods in collecting evidence in the present case. During the investigation, Sergeant Parks learned that a possible suspect had placed a weapon in the suspect's home. Upon speaking with residents there, Taylor, Sr. notified the detectives that he was in possession of the weapon in question. They arrived at a Texaco station to meet Taylor, Sr., and Taylor indicated that the weapon was hidden inside a plastic bag beside the ice machine. Sergeant Parks identified at trial the weapon that he found that day, a .32 caliber revolver. On cross-examination, Sergeant Parks stated that he did not know whether the weapon was tested for fingerprints.

James E. Johnston, Jr., a criminal investigator in the gang unit for the Shelby County District Attorney General's Office, testified that he was asked to transport a weapon to the Tennessee Bureau of Investigation ("TBI") for ballistic testing with bullet packs retrieved from the medical examiner's office. He identified the box that he used to transport the weapon to the TBI.

Special Agent Dan Royse, a forensic scientist supervisor with the Firearms Identification Unit at TBI, testified as an expert in firearms identification. He explained that firearms identification is a "discipline of forensic science that deals with the examination of fired bullets, fired cartridge cases, fired shot shell cases, and other ammunition components to determine which specific firearm" had been used in a given situation. From his testing of the handgun and the five bullet packs, Special Agent Royse determined that the handgun was in "normal operating condition." He also determined that four of the five bullet packs were fired from the handgun given to him for testing. One of the bullet packs contained fragments of the bullet that were too small to determine conclusively that the bullet was fired from that handgun. However, Special Agent Royse acknowledged that the fragment could have been part of another fragment tested and matched to the handgun.

At the conclusion of the State's proof, the defense moved for judgment of acquittal, and the trial court denied the motion. The Defendant chose not to testify, and the defense presented no witnesses. The jury deliberated and found the Defendant guilty of first degree murder in the perpetration of a robbery and first degree premeditated murder. The trial court merged the two offenses[4] and sentenced the Defendant to life imprisonment.

The Defendant filed a motion for new trial, which the trial court subsequently denied. He now appeals, arguing that the trial court erred in denying the Defendant's request for mistrial following statements made by Sergeant Quinn. He also challenges the sufficiency of the evidence supporting his convictions.

## Analysis

### *Sergeant Quinn's Testimony*

The Defendant contends that "the trial court erred and abused its discretion in failing to grant a mistrial concerning the statements of Sergeant Mundy Quinn." The State responds that the trial court properly denied the Defendant's request for a mistrial.

The determination of whether to grant a mistrial is a decision left to the trial court's sound discretion, and this Court will not disturb the trial court's determination "absent a clear abuse of discretion on the record." State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002). Essentially, "[t]he purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). A court should grant a mistrial only when a "manifest necessity for such action" exists. State v. Saylor, 117 S.W.3d 239, 250 (Tenn. 2003) (citing State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991)). "'In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did.'" Saylor, 117 S.W.3d at 250 (quoting State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000)). The party seeking the mistrial bears the burden of establishing its necessity. Williams, 929 S.W.2d at 388.

In deciding whether to grant a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (quoting Jones v. State, 403 S.W.2d 750, 754 (Tenn. 1966)). This Court has considered the following three factors in assessing whether the trial court abused its discretion in its decision not to grant a mistrial: "(1) whether the State elicited the

_____

[4] Although not specified in the transcript, the judgment orders reflect that the trial court merged the first degree premeditated murder conviction into the first degree felony murder conviction.

-12-

testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." State v. Welcome, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007).

Turning to the first factor, whether it was the State who elicited the questioned testimony, here Sergeant Quinn was responding to a question posed by the defense. Defense counsel, on cross-examination, had asked Sergeant Quinn whether it was he or another investigator who retrieved the Defendant from the school for questioning. When Sergeant Quinn answered that it was another investigator, defense counsel responded, "Another investigator did? Is it fair to state were you the directing officer in this investigation or were you just doing what you were told?" Sergeant Quinn answered, "Well, I mean there was [sic] two separate investigations going on at once." Given that Sergeant Quinn's testimony was a response to defense counsel's questioning and not the State's, the first factor weighs against an abuse of discretion determination.

We next turn to the second factor, which is whether the trial court provided the jury with a curative instruction. Following lengthy discussion among the trial court, the defense, and the State, the trial court denied the defense's motion for mistrial. The trial court did not give a curative instruction to the jury, but no such instruction was requested by the defense. As a result, "the right to a curative instruction was waived when [defense] counsel failed to request it." State v. McPherson, 882 S.W.2d 365, 371 (Tenn. Crim. App. 1994) (citing State v. Mackey, 638 S.W.2d 830, 835-836 (Tenn. Crim. App. 1982)); see also State v. Griffis, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997) ("If a party fails to request a curative instruction . . . , the party effectively waives the issue for appellate purposes."). Therefore, this factor weighs against an abuse of discretion on the part of the trial court.

Finally, we look to the third factor, which is "the relative strength or weakness of the State's proof." Welcome, 280 S.W.2d at 222. The jury had more than ample proof to convict the Defendant. The Defendant gave a statement implicating himself in the robbery which resulted in his shooting the victim. Ingram, the Defendant's accomplice, corroborated the Defendant's statement. Additionally, the forensic evidence supported the jury's verdict. Therefore, this final factor clearly weighs against an abuse of discretion determination. Accordingly, the Defendant is entitled to no relief on this issue.

The Defendant asserts that this Court should grant relief under a plain error review. We first note that we have held that the Defendant is not entitled to relief on the merits of this issue because the trial court did not abuse its discretion. Moreover, the Defendant would not receive relief under a plain error review because, as noted in looking at the substantial proof in this case, the error did not "probably change[] the outcome of the trial." State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (stating that relief will not be granted when the record

establishes that at least one of the five elements of plain error relief cannot be met) (quoting State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)).

*Sufficiency of the Evidence*

The Defendant also challenges the sufficiency of the evidence supporting his convictions for first degree murder. Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The appellate court does not weigh the evidence anew. Rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Furthermore, it is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn. Crim. App. 2003) (citations omitted).

The trial court merged the two murder convictions, and the judgments reflect that the conviction for first degree premeditated murder was merged into the conviction for first degree murder in the perpetration of a robbery. First degree felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree

murder, act of terrorism, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (Supp. 2007). Therefore, we first must consider whether the evidence was sufficient for the jury to determine that the Defendant committed one of the underlying felonies required to convict the Defendant of first degree felony murder.

The State's theory of the case was that the Defendant killed the victim in the commission of a robbery. Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2006). A person commits theft of property "if, with the intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Id. § 39-14-103 (2006).

The State presented ample evidence for the jury to conclude that the Defendant, with the intent to rob the victim, deprived the victim of his property by shooting the victim. In his statement, the Defendant stated that he and Ingram had followed the victim to a Shell gas station after hearing the victim discuss the payment of money with a lady. After leaving the Shell gas station, according to the Defendant, he "tried to rob" the victim. The victim, however, "rushed" the Defendant, and the Defendant shot the victim. After shooting the victim, the Defendant "went on ahead and got the money and walked off with [the victim's] shoes and the money."

Ingram testified to essentially the same facts leading up to the time that they left the Shell gas station. However, Ingram also remembered observing the victim put money in his shoe, and Ingram relayed this information to the Defendant. The Defendant also informed Ingram that he was going to rob the victim prior to doing so. As they left the Shell gas station, the Defendant waited for the victim on a side street, and Ingram continued walking down the street. Before crossing the street, Ingram heard gunshots, and he returned to find the victim on the ground. The Defendant admitted to shooting the victim. Ingram observed the Defendant kick the victim and confiscate the victim's shoes and some food.

The Defendant contends that the State failed to present sufficient evidence for a jury to convict the Defendant because, according to the Defendant, Ingram's testimony was "unreliable" based on the fact that he was an accomplice and was "was testifying in a self serving manner implicating the Defendant in an effort to exculpate himself."

In Tennessee, it is well-established that an accomplice's uncorroborated testimony cannot be the sole basis of a defendant's conviction. State v. Bough, 152 S.W.3d 453, 464 (Tenn. 2004); see also State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); Monts v. State, 379 S.W.2d 34, 43 (Tenn. 1964). Specifically,

There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged.

Bough, 152 S.W.3d at 464 (quoting Bane, 57 S.W.3d at 419).

In the case before us, we not only have the accomplice testimony of Ingram but the Defendant's own statement of admission. Moreover, video from the Shell gas station placed the Defendant and the victim together shortly before the incident. Finally, the forensic evidence also pointed toward the guilt of the Defendant. Therefore, the evidence presented at trial provided ample corroboration to Ingram's testimony that the Defendant shot the victim in the commission of a robbery. Thus, the evidence is sufficient to establish that the Defendant committed a robbery on the night of the incident.

We also must determine whether there was sufficient evidence to determine that someone was killed in the commission of the above felony. Testimony established that the victim died as a result of multiple gunshot wounds and that the manner of death was homicide. Additionally, Ingram testified that, shortly after Ingram heard the gunshots, he ran back to the victim and the Defendant, and the Defendant admitted to Ingram that he shot the victim. Moreover, in the Defendant's statement to police, he admitted to shooting the victim four times, and exactly four bullets were retrieved from the victim's body.

The Defendant also asserts that the Defendant's statement should be "disregarded" because "the statement was taken from the Defendant when he was a juvenile (17 years old), without a parent, guardian or attorney present." However, the Defendant moved to suppress his statement prior to trial, and the trial court denied that motion. Moreover, the Defendant failed to raise the suppression issue in his motion for new trial or as a separate issue on appeal. Therefore, the Defendant has waived review of this issue. See Tenn. R. App. P. 3(e). Accordingly, the statement properly was before the jury. The State clearly presented sufficient evidence to establish that the victim died during the commission of the robbery. Therefore, the evidence is sufficient to support the Defendant's first degree felony murder conviction. Accordingly, he is entitled to no relief on this issue.

Although the Defendant's two convictions were merged, we also will address the sufficiency of the evidence for his merged offense, first degree premeditated murder, should an issue arise as to the felony murder conviction upon further appeal. First degree premeditated murder is defined as "a premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2007). The existence of premeditation is a factual determination to be made by the jury in light of all the surrounding circumstances. State v. Schmeiderer, 319 S.W.3d 607, 635 (Tenn. 2010); see also State v. Vaughn, 279 S.W.3d 584, 594-95 (Tenn. Crim. App. 2008). Premeditation is defined by statute as:

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(d) (Supp. 2007).

Because premeditation requires insight into the defendant's state of mind, a jury may infer the defendant's intent based on his or her actions and the surrounding facts and circumstances of the killing. State v. Jackson, 173 S.W.3d 401, 408 (Tenn. 2005); see also Young, 196 S.W.3d at 108; Vaughn, 279 S.W.3d at 594-95. Thus, "[a]lthough a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing." Jackson, 173 S.W.3d at 408 (citing Bland, 958 S.W.2d at 660).

Our Supreme Court has identified a number of relevant circumstances that may indicate premeditation, including: "the use of a deadly weapon upon an unarmed victim; . . . evidence of procurement of a weapon; . . . calmness immediately after the killing," Bland, 958 S.W.2d at 660; and "failure to provide aid or assistance to the victim," State v. Brooks, 249 S.W.3d 323, 329 (Tenn. 2008) (citations omitted). Additionally, the jury also may take into consideration "the shooting of a victim after [the victim] had turned to retreat or escape." State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000) (citations omitted).

The State provided sufficient evidence at trial for a jury to convict the Defendant of first degree premeditated murder. Although the Defendant stated to police that he shot the victim when the victim "rushed" him, he also stated that he shot the victim four times with a handgun. Ingram testified that, prior to the shooting on September 9, 2009, the Defendant showed Ingram a gun in his pocket and told Ingram that he was going to rob the victim, indicative of the Defendant's procurement of a weapon. See Bland, 958 S.W.2d at 660.

Later, after Ingram heard gunshots, he ran back to where the Defendant was standing. He observed the victim on the ground, and the Defendant admitted to shooting the victim. Ingram observed the Defendant kick the victim "to the head or somewhere near the head," indicative of the Defendant's "failure to provide aid or assistance to the victim." Brooks, 249 S.W.3d at 329 (citations omitted). According to Ingram, the Defendant seemed calm as they walked toward the Defendant's house. Finally, Dr. Ross testified that the gunshots entered the victim's back, the back of the neck, the side of the head, and the top of the head. At the very least, the jury could have inferred from the place of entry of the bullets that the victim was not facing the Defendant when the Defendant shot him.

Viewing these facts with the strongest legitimate view in favor of the State, see Harris, 839 S.W.2d at 75, the jury had adequate evidence before it to find the existence of an intentional and premeditated killing sufficient to support a first degree premeditated murder conviction.

## CONCLUSION

For the reasons articulated above, we affirm the Defendant's convictions.

_____
JEFFREY S. BIVINS, JUDGE